IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2016 Session

**STATE OF TENNESSEE v. VAN TRENT**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S60042     R. Jerry Beck, Judge**

**No. E2015-00354-CCA-R3-CD – Filed March 30, 2017**

The Appellant, Van Trent, was convicted by a Sullivan County Criminal Court Jury of five counts of facilitation of dogfighting. The Appellant received concurrent sentences of eleven months and twenty-nine days for each conviction, sixty days of which was to be served in confinement and the remainder on probation. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions, the trial court's instructing the jury on lesser-included offenses over the Appellant's objection, the denial of the Appellant's right to counsel, the admissibility of expert testimony regarding the causation of scarring to the dogs, the introduction of the Appellant's appearance bond as rebuttal proof, and the trial court's denial of full probation. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Gene G. Scott, Jr., Jonesborough, Tennessee (on appeal), and J. Matt King, Kingsport, Tennessee (at trial), for the Appellant, Van Trent.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Barry Staubus, District Attorney General; and Julie R. Canter, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

During a search of 1207 Imperial Drive in Kingsport, the police found four scarred pit bulls and a multitude of items related to dogfighting. The police discovered that the address was listed on the Appellant's driver's license and checking accounts as his address. Thereafter, the Appellant was charged with nine counts of dogfighting.

At trial, Sergeant Jimmy Wayne McCready of the Sullivan County Sheriff's Department testified that on October 20, 2011, he was standing in the front yard of 1207 Imperial Drive, waiting to execute a search warrant. The Appellant walked up to him, and Sergeant McCready asked if he could help the Appellant. The Appellant responded that "it was his home or his house and wanted to know what was going on." At that point, Sergeant McCready asked one of the detectives to speak with the Appellant. Sergeant McCready had no further contact with the Appellant.

On cross-examination, Sergeant McCready acknowledged that in the statement he gave to Detective Richard Kindle on February 2, 2012, he said that "homeowner Van Trent [the Appellant] showed up." Sergeant McCready explained that although the Appellant "never mentioned [being the] homeowner, he mentioned that he was – it was his house, is how he put it."

Sullivan County Detective[1] Richard Kindle testified that he executed the search warrant around dusk on October 20, 2011. Janette Reever with the Humane Society of the United States also participated in the search. During the search, Detective Kindle found four pit bull dogs in the backyard. Two of the dogs were in separate kennels. The other two dogs were each chained to a different car axle that had been driven into the ground.

Detective Kindle also found a wooden treadmill in a storage building. The Appellant told Detective Kindle that he made the treadmill. Detective Kindle found a document titled "For historical purposes only, Cajun Rules." The rules, which were for dogfighting, had been written by "G.A. (Gaboon) Trahan." The rules had been printed from the web site "sporting-dog.com." Detective Kindle found several books and magazines about pit bulls. Additionally, Detective Kindle found a metal sled and a plastic tackle box. The words "Liberty Farms" and "show" were written on each end of the tackle box. Detective Kindle found framed photographs of "Old Mountain Men Kennels" and the Appellant's son, Travis Trent,[2] posing with a dog. Detective Kindle found IV tubing, syringes with needles, and two prescription bottles containing pills. He

---

[1] At the time of trial, Detective Kindle had left the Detective Division to become a patrol officer due to "[p]ersonal health problems."

[2] Some of the individuals in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

found a kennel registration with the American Dog Breeders Association (ADBA). The police also found antiseptic ointment, dietary supplements, various veterinary items, a large metal spring, a nylon harness, dog show award ribbons, and pedigree charts. Detective Kindle discovered a dry cleaning receipt from a business in North Carolina; the receipt was dated April 4, 2011. Detective Kindle also found a receipt from a hotel in North Carolina that reflected a stay from January 30, 2011, to February 2, 2011.

From the Appellant's vehicle, Detective Kindle recovered the Appellant's personal checks. The checks listed the Appellant's address as 1207 Imperial Drive.

On cross-examination, Detective Kindle acknowledged that the search warrant reflected that the residence belonged to "Travis Trent" and did not mention the Appellant's name. When Detective Kindle spoke with the Appellant at the property, the Appellant was cordial and respectful. Detective Kindle stated that he found two checkbooks in the Appellant's vehicle. The checks from the Appellant's account at Eastman Credit Union reflected that the Appellant's address was 1207 Imperial Drive. The other checks, which were from the Appellant's account at Charles Schwab, reflected that his address was 5104 Antler Ridge Court, Raleigh, North Carolina.

Detective Kindle said that he found no evidence of dogs or dogfighting in the Appellant's vehicle. Additionally, he found no evidence that dogs had been on the wooden treadmill the Appellant had made. Detective Kindle conceded that he found no evidence inside the residence that indicated the Appellant was living there.

Detective Kindle said that in the house, he found a kennel registration that stated "Liberty Farms, Lovers and Breeders of American Stratfordshire [sic] and Pit Bull Terriers, Travis and Jill Trent, Kingsport, Tennessee." Detective Kindle found no evidence that the Appellant was associated with the dogs, the dog shows, or Liberty Farms Kennel. The Appellant's name was not on any of the magazines found at the house, and Detective Kindle did not find any evidence that the Appellant had bought the veterinary supplies or had used them on the animals. Detective Kindle did not find videos or photographs of dogfighting, a fighting pit, a wash tub, sponges, weight scales, blood, or dogfighting contracts.

Detective Kindle said that after the four dogs were removed from the property, they were taken to Dr. Becky DeBolt, a veterinarian, for examination.

On redirect examination, Detective Kindle stated that the Appellant said he did not know where Travis Trent was; nevertheless, from the dry cleaning and hotel receipts, Detective Kindle surmised that Travis Trent was in North Carolina. Detective Kindle noted that the Appellant showed up at the property at the beginning of the search and that despite Travis Trent's absence from the property, the dogs had been fed and watered.

Detective Kindle stated that the dog books and magazines were not hidden and were openly displayed in the living room. Detective Kindle knew that dogfighting was "secretive"; therefore, he was not surprised when he was unable to find "clearly labeled and named evidence." Detective Kindle noted that the Appellant had said he made the wooden treadmill by hand and that the police found woodworking tools in the house.

The parties stipulated to the admission of an affidavit that reflected the Appellant applied to Eastman Credit Union on October 20, 2011, and that the application reflected his address was 1207 Imperial Drive. Additionally, the parties stipulated to the admission of copies of the Appellant's 2010 and 2012 Tennessee driver's licenses. Each license reflected that the Appellant's address was 1207 Imperial Drive. The parties also stipulated to the admission of a check from the Appellant's account at Regions Bank. The check, which was written on April 26, 2010, listed the Appellant's address as 1207 Imperial Drive. Finally, the parties stipulated to two separate vehicle registrations in the Appellant's name. The application for registration for a 1993 Toyota was made on January 6, 2006, and the vehicle registration renewal was dated February 4, 2011. The application for registration for a 1994 Nissan was made on February 13, 2007, and the vehicle registration renewal was dated February 4, 2011. Both applications and both renewal forms listed the Appellant's address as 1207 Imperial Drive.

Sullivan County Detective Matthew Price testified that he found two security cameras mounted on the exterior of the house: one camera was located on the front porch, and the other was aimed at a portion of the driveway. The cameras were motion activated and were linked to a digital video recorder (DVR). The police recovered recordings that were made from October 1 to October 16, 2011. The recordings showed the Appellant coming to the property on four separate occasions. On each occasion, he arrived in a white Toyota then walked toward the garage. No cameras were directed toward the backyard, the storage building, or the back door of the house.

On cross-examination, Detective Price said that the security recordings revealed the Appellant spent almost six hours at the residence on October 2, he spent almost three and one-half hours at the property on October 7, and he spent the night at the property on October 12 and on October 14. The recordings showed only the Appellant's arrivals and departures, not his activities while at the property.

Janette Reever, an expert in dogfighting, testified that she assisted with the search of the house, yard, and outside building. A "whelping kennel" for breeding dogs was in the garage. Four American pit bull terriers were found in the backyard. Their names were "Sadie, Brew, Blaze, and No Name." Two of the dogs were on large chains. Each chain was attached to half of a car axle; each axle had been driven into the ground far enough apart so the dogs could not reach each other. The chained dogs were "adjacent

to" two dogs that were in separate wire kennels. While waiting for animal control officers to arrive, Reever interacted with the dogs. The dogs were not aggressive toward her, which Reever said was common for fighting dogs because they had to be around people before, during, and after fights.

Reever said that the injuries sustained by dogs as a result of professional dogfighting usually occurred to the front legs, head, muzzle, or "stifle area" on the rear leg. In her work as a veterinary technician, Reever also had seen untrained dogs after non-staged fights, and she said that the injuries were different than those sustained during an organized dogfight. Generally, a dog injured in a non-staged fight had assumed a "submission position" and, as a result, received injuries to the neck or abdominal area.

Reever examined photographs that were taken of the four dogs retrieved from Imperial Drive. Reever identified numerous scars on the muzzle, ears, front legs, and rear leg of the first dog, a "pup" approximately one year old. She did not identify the name of the first dog. The second dog, "No Name," who was also approximately one year old had scars to the head, ear, above the eye, shoulder, and "all over" the front legs. Additionally, the dog had multiple healed puncture wounds and a laceration above the eye. The third dog, a seven- to nine-year-old Reever did not identify by name, had scars to the ear and shoulder, "pressure sores" on the front leg, and a healed puncture wound. The final dog, Sadie, who was approximately eleven years old, had lacerations to the ear, scarring on the "hock area," a healing puncture wound, and a pressure sore. Reever said that based upon her training and experience, her "expert opinion [was] that these dogs were being raised and bred for the purpose of dogfighting."

Reever said that a tackle box, which she called a "crash kit," was found in the garage. The kit contained white and black chalk, and each shade could be used to conceal a dog's scarring. Another item, an alligator hemostat, was a surgical tool for "pinch[ing] off" a blood vessel for suturing. The kit also contained an IV catheter, bag, and line that could be used to "rapidly deliver intravenous fluids" to combat the effects of blood loss, stress, and shock in a dog after a fight. Further, the kit contained betadine, an antiseptic for cleaning the area where the IV would be inserted. Additionally, the kit contained saline solution which could be used for hydrating a dog, rinsing a wound, and diluting medications. Reever explained that crash kits were commonly found at the homes of dogfighters because dogfighters had to personally treat their dogs instead of calling a veterinarian after a fight.

Reever said that several of the dietary supplements found at the property were used to help rebuild muscles of dogs that were "heavily worked." Another supplement was for "flush[ing] out the kidneys" after a dog was given steroids so the dog's kidneys would not "fry."

Reever stated that a "break stick" was found at the residence and that the words "Liberty Farms Show" were written on the side of the stick. Reever explained that a break stick was used to pry open the mouth of a pit bull dog. The stick had visible teeth marks on it, which indicated the stick had been used.

Reever recalled that copies of the "Sporting Dog Journal" and the "American Pit Bull Terrier Gazette" were found in the living room. The "Gazette" was published by the ADBA, which certified and registered pedigrees for pit bulls. The "Sporting Dog Journal" was an "underground" journal used to disseminate information about training dogs for fighting. Reever stated that the "Sporting Dog Journal," which was often found in the homes of dogfighters, could be purchased only if a known professional dogfighter vouched for the purchaser.

Reever said that professional dogfighters usually had their own kennel name and had dogs with established bloodlines. Reever said that dogfights, which were often referred to as shows, matches, or events, were established on a professional level by either a written contract, "a gentleman's agreement," or a handshake. Reever noted that contracts were seldom written; therefore, handshakes were the most common way of establishing an agreement.

Reever noted that dog pedigrees were found in the living room, but none were for the dogs discovered at the residence. Nevertheless, one of the pedigrees was "addressed to Jill and Travis Trent" and was for a dog registered to Liberty Farms Kennel. Each of the pedigrees listed dogs in the lineage that were well-known among dogfighters. The pedigrees also contained "code words" and were of the type of pedigrees that were commonly "found at properties where dogs are being trained for fighting purposes."

Reever identified a copy of "The Cajun Rules" that was retrieved from the residence. She explained that in the 1950s, Louisiana Chief of Police G.A. Gaboon Trahan wrote the Cajun Rules, which were the most frequently used rules of dogfighting. Reever said that during the eight-week period before a fight, a dogfighter generally trained and conditioned the dog on a daily basis. Dogfighters referred to the period of conditioning as "the keep." The keep included making the dog run, usually on a treadmill, for one hour to one hour and forty-five minutes each day.

She noted that a flirt pole and a spring pole were found on the property. A flirt pole was made of a long, stable object, such as a branch or a piece of PVC, from which was dangled an item of "high value" to the dog, such as animal hide or a stuffed animal. A spring pole was made from a spring hanging from a solid, stable object, such as a pole, from which a high value item was dangled. A sled was also found on the property. She opined that the sled was too small for legitimate weight pulling but that it could be used to increase a dog's endurance.

On cross-examination, Reever acknowledged that a photograph of the first dog showed an injury to the rear area. Reever acknowledged that during a "nonstaged" fight, a dog could be injured on the rear area but that the injury would typically be "by the base of the tail where the dog is trying to run away." In the photograph, however, the injury was not around the base of the tail and was instead on "the top side area. It's called the stifle." Reever said that although she noticed injuries to the dogs' ears, none of the dogs had pieces of ear missing. She said that the injuries to "No Name's" front legs were inconsistent with the dog being in a submission position. The third dog had wounds consistent with pressure sores, which Reever could not say were caused by dogfighting. The oldest dog, eleven-year-old Sadie, who was not extensively scarred, had some scarring to her ear and healed injuries to the stifle area. Reever was not certain the injuries were caused by dogfighting; nevertheless, if the injuries were caused by dogfighting, the fighting was not recent. Reever explained that even if a dog was not used for fighting, it could be used to breed fighting dogs if it had a desirable blood line.

Reever acknowledged that she had no evidence of the Appellant attending or betting on a dogfight. She conceded that the Appellant's name was not on any of the pedigrees for Liberty Farms Kennel, but she stated, "A kennel can be a multitude of people. . . . Just because someone's name is on a kennel, there could be other partnerships that are also involved in there." Reever stated that the authorities did not find a fighting pit during the search but asserted that it would have been unusual to find a fighting pit where fighting dogs were housed.

Reever stated that the harness and sled found at the property could serve the dual purposes of legitimate weight pulling and "conditioning a dog for a keep." She looked at a photograph and agreed that the dog in the photograph was wearing a harness similar to the one found at the residence, that the dog appeared to be engaging in a weight pull, and that the man in the photograph appeared to be Travis Trent. The Appellant was not in the photograph.

Reever stated that the tackle box found at the residence was a crash kit for treating wounds received in a dog fight but that she had no proof that the contents of the box had been used.

On redirect examination, Reever noted that the two female dogs found at the property had not been spayed and that the two male dogs had not been neutered. She opined that if a sled and harness were found at the same residence as a copy of the Cajun rules for dogfighting, she did not think the sled and harness would be used for "legitimate" purposes. She said that the items found in the crash kit were not used in weight pulls. She said that any one of the items found by the police, if considered on its

own, did not suggest conclusively involvement in dogfighting but did suggest dogfighting if considered together.

As the defense's first witness, Dr. Bea Moody testified that she was a veterinarian who treated mainly dogs and cats. The trial court allowed her to be designated as an expert in the field of veterinary medicine.

Dr. Moody said that in the course of her practice, she had seen dogs, including pit bulls, that had been injured during a fight. She said that the types of wounds depended on how many dogs were involved in the fight and the size of the dogs. She said that pit bulls had huge jowls made up of "rock-hard muscle" and that they had the strength to "rip" skin and limbs from other dogs. Dr. Moody said that pit bulls usually would attack near another dog's groin or neck. Nevertheless, she asserted that pit bulls were "good dogs" and that she did not "see a whole lot of pit fights."

Dr. Moody said that after the four dogs were taken from the Imperial Drive residence, they then were taken to Young-Williams Animal Shelter. Several months later, the Appellant contacted Dr. Moody and asked her to examine the dogs. Dr. Moody's first visit was on August 9, 2012. She said that the dogs were "excellent" and were not aggressive.

Dr. Moody said she was provided a list of items that were seized from the Imperial Drive property. She had to do independent research because she did not recognize some of the items. She talked with clients that owned pit bulls and a "master groomer" that showed and bred pit bulls. She also reviewed the "records and findings" of Dr. DeBolt, who was "the veterinarian in charge of Young-Williams Animal Shelter." Dr. Moody also looked at photographs of the dogs that were taken in November.

Dr. Moody maintained that she and Dr. DeBolt found "no scars indicative of dogfighting." Instead, Dr. Moody found evidence of "normal wear and tear." She observed that eleven-year-old Sadie had minimal scarring and that none of the scarring indicated she had been involved in dogfighting. She stated that one of the young dogs had scars on his legs. She said that the dog was housed with another young dog and that the scarring could be from the dogs playing and gnawing on each other. In conclusion, she opined, "These dogs have not been involved in fighting. There's no evidence, physical or otherwise in my mind, that they have been involved in fighting, or I wouldn't be here."

On cross-examination, Dr. Moody said that she had examined the flirt pole. She had to "look it up 'cause [she] wasn't sure what it was." When asked if she was aware that the flirt pole was often used to train dogs to fight, Dr. Moody responded, "I'm learning." Dr. Moody did not know that the "Sporting Dog Journal" was an underground

publication that posted results from dogfights. She acknowledged that a copy of the "Cajun Rules" was recovered from the residence. She stated, however, "I have several things at my house, books of witchcraft, Wiccan [sic], Buddhism, Hinduism. That doesn't make me that, it makes me want to expand my horizons."

Dr. Moody said that her brother once owned a pit bull. Her brother had a flirt pole for the dog but did not have a copy of the Cajun Rules. She acknowledged that she examined the dogs about nine months after they were confiscated and that the dogs had been fed, watered, and given medical care at Young-Williams Animal Shelter. Dr. Moody stated that she had a "mobile . . . home practice" and that less than five percent of her clients were pit bulls. Dr. Moody conceded that she had never participated in an animal fighting investigation, that she had never testified as an expert witness, and that she had no training in veterinary forensics. Dr. Moody did not x-ray the dogs to see if they had any healing or healed fractures. Instead, she watched to see if the dogs were moving properly. Also, during a physical examination of the dogs, she closed her eyes and felt for callous formations, which were indicators that a bone had been broken and healed. Dr. Moody conceded that "most forensic veterinarians who have advance training in dogfighting" perform x-rays.

Dr. Moody said that pit bulls were "extremely wonderful dogs" and that they were "very brilliant" and eager to please their owners. Although she recognized that some fighting pit bulls might not be aggressive toward people, she believed that "there would be some kind of behavior patterns with those dogs, that if they were fought, that you could tell that they were fought." She acknowledged that she had no training to support that belief, but she asserted that the belief was supported by her twelve years of experience with seeing dogs that have been involved in fighting, such as when multiple dogs were in one home and fought over food or about mating. She conceded that she had never treated an animal that had been in an organized dogfight.

Gladys Jo "Joy" Foster testified that she was employed by the United States Postal Service and that she knew the Appellant. Foster delivered mail five or six days per week. On October 20, 2011, her postal route included 431 Cope Road, which she asserted was the Appellant's address. She noted that her route was almost seventy-one miles long and that she occasionally stopped at the Appellant's mobile home to use the restroom. She said that she had seen the Appellant and his vehicle at the residence on most of the days she delivered mail and that she often stopped to talk with him.

On cross-examination, Foster said that she and the Appellant had dated for three or four years; their relationship ended more than twenty-three years ago. She usually delivered mail to the Appellant's Cope Road address after 2:00 p.m., but she was never there after dark.

Alvin Monroe testified that his daughter had a child with Travis Trent. Monroe's daughter and Travis Trent had lived together on Imperial Drive. During his daughter's relationship with Travis Trent, Monroe met the Appellant. On four or five occasions, Monroe went to the Appellant's home on Cope Road. Monroe did not know of the Appellant ever living on Imperial Drive. Monroe said that he had known the Appellant for eight years and did not know of the Appellant owning a dog. However, Travis Trent and Monroe's daughter owned dogs. Monroe went to a dog show in North Carolina with his daughter and Travis Trent. The show was "like you see on TV, Westminster [K]ennel. Strictly pit bulls. They got out there, paraded them around, and they had these judges that evaluated them. And then later they would hand out awards." Immediately after the dog show, they attended a weight pull.

Monroe said that when he visited Imperial Drive, the dogs were "playful" and "rambunctious." He did not see the Appellant interact with the dogs.

On cross-examination, Monroe said that his daughter never married Travis Trent. Monroe's daughter and Travis Trent were together for two or three years, and their relationship ended six or seven years before trial. Monroe did not visit Imperial Drive after his daughter's relationship with Travis Trent ended. Monroe said he remembered seeing a tackle box at the dog show with Travis Trent. Monroe knew that in October 2011, Travis Trent was working for Shane Trent in North Carolina.

Claude Wallace Ketron III testified that he and his wife had lived at 433 Cope Road for five years and that they had owned rental properties in that area for fifteen years. The Appellant had rented 431 Cope Road, which was one of Ketron's rental properties, since May 14, 2002. Ketron said that the Appellant's property was located approximately five feet from Ketron's property. Ketron saw the Appellant "quite often in and out through the week, daily."

Ketron said that in the ten years he had known the Appellant, the Appellant had never owned any animals or expressed an interest in dogs. Travis Trent and his son had visited the Appellant at the Cope Road residence. Ketron identified photographs showing the Appellant's grandson and the grandson's cousin playing at the dock behind the Appellant's mobile home.

On cross-examination, Ketron acknowledged that he did not monitor his tenants but occasionally noticed their comings and goings. Ketron did not know if the Appellant came home every night but stated that he saw the Appellant's van each morning and evening. Ketron acknowledged that he had never been to Imperial Drive. Ketron stated that the Appellant paid his rent each month by check but that he did not notice what address was on the Appellant's checks. Ketron stated that the Appellant had a van and a truck.

The parties stipulated to the admission of records from electrical services in Bristol, Tennessee. The record reflected that the account for 431 Cope Road was opened in the Appellant's name in 2002. Additionally, the parties stipulated to the admission of the Appellant's account for water at 431 Cope Road. Finally, the parties stipulated to the admission of the August 13, 1997 warranty deed for 1207 Imperial Drive in the names of Jill Workman and Travis Trent and the March 25, 2003 quitclaim deed from Workman to Travis Trent.

On rebuttal, the State introduced a certified copy of an appearance bond dated November 4, 2011. The appearance bond was signed by the Appellant, and the address listed on the bond was 1207 Imperial Drive. The bond was issued by Tri-City Bonding Company.

The jury found the Appellant guilty of eight counts of facilitation of dogfighting.[3] The jury also found the Appellant guilty of a ninth count of facilitation of dogfighting for allowing the premises under his control to be used for possessing or keeping dogs for fighting. The trial court merged the convictions for each dog, resulting in five total counts of facilitation of dogfighting. The court sentenced the Appellant to concurrent sentences of eleven months and twenty-nine days, sixty days of which was to be served in confinement with the remainder on probation.

On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions, the trial court's instructing the jury on lesser-included offenses over the Appellant's objection, the denial of the Appellant's right to counsel, the admissibility of Reever's testimony regarding the causation of the scarring to the dogs, the introduction of the Appellant's appearance bond, and the trial court's denial of full probation.

## II. Analysis

### A. Right to Counsel

Prior to trial, the Appellant was represented by J. Matt King and Wayne Culbertson. Immediately prior to the voir dire of the jury, the State informed the trial court that it had spoken with counsel about a potential conflict of interest because Culbertson also represented Travis Trent, who was the Appellant's son and co-defendant in the instant case. The State said that it had provided defense counsel with a copy of State v. Parrott, 919 S.W.2d 60 (Tenn. Crim. App. 1995), which stated that a defendant must knowingly and intelligently waive his right to conflict-free counsel in the event of

---

[3] Four of the counts related to "possessing" each of the dogs for fighting, and the other four counts related to "keeping" each of the dogs for fighting.

an actual conflict caused by joint representation. Defense counsel responded that they would discuss the issue with the Appellant.

The State maintained that Culbertson had asked why the State was raising the issue for the first time on the first day of trial. The State responded that it had thought that King represented the Appellant and that Culbertson represented Travis Trent and had recently become aware that Culbertson represented both defendants.

Culbertson acknowledged that his joint representation caused an apparent problem. King said that he and Culbertson had thought that the Appellant and Travis Trent would be tried jointly and that he and Culbertson had intended to represent the defendants together. Culbertson said that he and King had worked together and that the Appellant wanted both attorneys to represent him. Culbertson acknowledged that King "ha[d] worked on this case and done a whole lot more work on it than I have as far as this trial [is] concerned." Culbertson said that the State was trying to "conflict [him] out" because he did not have a written waiver from Travis Trent, who was in federal custody in another state. The State asserted that it was trying to prevent "an obvious post-conviction issue" that could arise from the failure to obtain sufficient waivers from the defendants.

Culbertson maintained that he was "not so sure there [was] a conflict, the way we were looking at this." The State argued that, at a minimum, an appearance of conflict existed. The State asserted that without an affidavit from Travis Trent, Culbertson could not represent the Appellant at trial. Culbertson conceded, "I think he's right."

Culbertson asked for a continuance to obtain a waiver from Travis Trent. The trial court expressed its disinclination to continue the case, noting that it had prevented an officer from going on vacation in order to testify and that an expert witness from Washington, D.C., was present to testify. The trial court examined <u>Parrott</u> and asked the parties for suggestions on what should be done. The State observed that in the instant case, the evidence was found in a home that the defendants apparently shared and that the defendants could attempt to implicate each other. Therefore, the State opined that King was not disqualified from representing the Appellant but that a problem would occur if Culbertson represented the Appellant at trial and then represented Travis Trent in subsequent proceedings related to the same charges. At that point, Culbertson offered to withdraw to "take care of th[e] problem."

On appeal, the Appellant contends that the trial court violated his right to be represented by the counsel of his choice by ruling that Culbertson could not represent him without a waiver from Travis Trent. The Appellant maintains that the trial court misread <u>Parrott</u> and improperly concluded that a waiver must be obtained not only when an actual conflict of interest exists but also when only a possible conflict of interest exists. The

Appellant asserts that, at most, a possible conflict of interest existed in the instant case and, therefore, that no waiver was necessary. In response, the State argues that an actual conflict of interest existed and that the trial court did not err in its ruling. We agree with the State.

Initially, we note that Culbertson voluntarily withdrew from representation to alleviate the conflict before the trial court made a formal ruling on whether to force Culbertson to withdraw. Accordingly, this issue is arguably waived. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Nevertheless, we note that "the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant in a state criminal prosecution the assistance of counsel." State v. White, 114 S.W.3d 469, 475 (Tenn. 2003) (citing Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984)). Generally, "the right to counsel includes the qualified right to the counsel of one's choice." Parrott, 919 S.W.2d at 61 (citing Wheat v. United States, 486 U.S. 153 (1988)). However, "'while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'" White, 114 S.W.3d at 475 (quoting Wheat, 486 U.S. at 159). "The right to be represented by counsel of one's choice is qualified and 'must be balanced against the requirements of the fair and proper administration of justice.'" State v. Huskey, 82 S.W.3d 297, 305 (Tenn. Crim. App. 2002) (quoting United States v. Micke, 859 F.2d 473, 480 (7th Cir. 1988)). This court will reverse a trial court's ruling on attorney disqualification only if the record shows an abuse of discretion. White, 114 S.W.3d at 475. An abuse of discretion occurs when a court applies an incorrect legal standard or reaches a decision against logic or reasoning that causes injustice to the complaining party. Id.

Our supreme court has stated that "[i]n determining whether to disqualify an attorney in a criminal case, the trial court must first determine whether the party questioning the propriety of the representation met its burden of showing that there is an actual conflict of interest." Id. at 476. In the instant case, the State, as the party raising the challenge, had the burden of establishing the conflict by a preponderance of the evidence. Id. This court has noted that "[a]n actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests." State v. Tate, 925 S.W.2d 548, 552 (Tenn. Crim. App. 1995); see also Clinard v. Blackwood, 46 S.W.3d 177 (Tenn. 2001). In other words, an actual conflict of interest exists when counsel "is placed in a position of divided loyalties." McCullough v. State,

- 13 -

144 S.W.3d 382, 385 (Tenn. Crim. App. 2003). An actual conflict may occur during instances of multiple representation; i.e., when one attorney simultaneously represents clients with differing interests. White, 114 S.W.3d at 476.

As the State argued, part of the Appellant's defense concerned establishing that 1207 Imperial Drive and the evidence found there belonged to Travis Trent, not to the Appellant. In other words, a major part of the Appellant's defense was to implicate Travis Trent. "An actual conflict is said to exist when 'counsel cannot use his best efforts to exonerate one defendant for fear of implicating the other.'" State v. Ray Edward Polk, No. 1194, 1991 WL 188885, at *5 (Tenn. Crim. App. at Knoxville, Sept. 26, 1991) (quoting United States v. Auerbach, 745 F.2d 1157, 1162 (8th Cir. 1984)). Moreover, the Tennessee Rules of Professional Conduct provide, in pertinent part, that

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Tenn. Sup. Ct. R. 8, RPC 1.7(a). Therefore, we conclude that the State established by a preponderance of the evidence that Culbertson's representation of the Appellant and Travis Trent was an actual conflict of interest.

Tennessee Rule of Criminal Procedure 44(d) provides that in cases of joint representation, the trial court

> shall promptly inquire about the propriety of joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe no conflict of interest is likely to arise, the court shall take appropriate measures to protect each defendant's right to counsel.

Further, the Tennessee Rules of Professional Conduct provide that

- 14 -

[n]otwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

Tenn. Sup. Ct. R. 8, RPC 1.7(b); see White, 114 S.W.3d at 479.

In the instant case, Culbertson and King told the trial court that the Appellant wanted to be represented by Culbertson, suggesting that the Appellant waived his right to conflict-free counsel. However, neither the Appellant nor Travis Trent executed a written waiver of conflict-free counsel. Regardless, our supreme court has cautioned that "even though a conflict of interest may be waived . . . , trial courts must remain vigilant and retain substantial latitude for refusing to accept a waiver because of the unpredictability of the dimensions of the conflict." Frazier v. State, 303 S.W.3d 674, 684 (Tenn. 2010) (citing Wheat, 486 U.S. at 162-63). We conclude that the Appellant is not entitled to relief on this issue.

## B. Expert Witness

Immediately prior to Reever's testimony at trial, defense counsel challenged her qualifications to testify as an expert regarding the causation of the dogs' injuries. The trial court offered to conduct a jury-out hearing to determine Reever's qualifications. The State asserted that Reever was not a veterinarian and that it intended to have her testify as an expert in dogfighting but that it did not intend to offer her testimony regarding causation. Defense counsel refused to stipulate that Reever was a dogfighting expert but maintained that he did not anticipate objecting to her expertise in dogfighting. The trial court ascertained that defense counsel was not requesting a jury-out hearing about Reever's qualifications and reconvened the jury.

Reever testified that she had an associate's degree in animal science. She attended the Northern Virginia Animal Control Academy, which lasted forty hours and included training in animal fighting. She also attended four animal cruelty courses, each of which lasted forty hours; animal blood sports training, which lasted thirty hours; and had thirty hours' worth of training on animal fighting, cruelty investigations, and body condition scoring. She said that as part of her training, she learned the basics of animal care, nutrition, behavior, first aid, anatomy, physiology, "how to triage an animal when they come in," anesthesia, and how to assist in surgery. She had also worked on three dogfighting investigations with Dr. Melinda Merck, an internationally-known forensic veterinarian. Reever stated that she had worked as a surgical technician and as a "lead technician" in a veterinary practice with sixteen doctors, as a lead technician at an overnight emergency veterinary clinic, and as a veterinary technician at a smaller animal hospital. She had spent nine years as the Deputy Chief of Loudoun County Animal Control in Northern Virginia, two years as an animal control officer in the District of Columbia, and almost two years as an animal control officer in South Carolina. She had also been an instructor in the field of dogfighting. At the time of trial, Reever was employed by the Humane Society of the United States (HSUS) as the Deputy Manager of Animal Fighting Response. Her duties included answering the animal fighting "tip line," through which dogfighting and cockfighting were reported; working with law enforcement on alleged dogfighting cases; and keeping "up to date on the current lingo for dogfighting, what bloodlines are prominent, and basically all the aspects of dogfighting." She stated that since 1996, she had been involved in hundreds of dogfighting investigations. She had observed and handled dogs that were rescued from fighting situations and saw their injuries and scars. Reever said that she previously had been qualified as an expert witness in dogfighting and cockfighting cases in Virginia, Pennsylvania, Michigan, Maryland, and Florida. Based upon the foregoing, the trial court qualified Reever as an expert in dogfighting.

Reever testified about the general practices of dogfighters and dogfights and her participation in the search of the Imperial Drive address. As Reever began to testify about the types and locations of injuries typically found in dogfighting cases, defense counsel objected, arguing that Reever could not testify "about causation of injuries. She's not been qualified as a medical expert. . . . She's been qualified about dogfighting." The trial court noted Reever had testified that due to her training and experience, she had seen dogfights and the injuries that occurred during dogfights. Defense counsel argued that the State intended to have Reever review the photographs of the dogs found during the search and to testify about the cause(s) of their injuries and scars. The trial court said that Reever's testimony was permissible, observing that she was qualified as an expert in dogfighting "[w]ithout much objection." The court also said that a layperson would know "that dogs get in a fight" and that "whether or not these dogs were in a fight's a matter for the Jury to decide." Defense counsel contended that

the State needed a veterinarian to testify about how the wounds were made. The trial court overruled the objection.

On appeal, the Appellant contends that the trial court erred by allowing Reever, who was an expert in dogfighting but was not a veterinarian, "to give unqualified expert medical opinion testimony concerning causation of scarring on the four dogs taken from the premises by authorities and on the ultimate issue of whether the dogs' purpose and use was for dogfighting." The State responds that the trial court properly allowed Reever to testify regarding the injuries based upon her expertise in dogfighting. We agree with the State.

Generally, expert testimony must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997). The trial court has broad discretion in determining the qualifications, admissibility, relevancy, and competency of expert testimony. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). As such, this court will not overturn the trial court's ruling on the admissibility of expert testimony absent an abuse of that discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Rule 703 requires that the expert's opinion be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), the United States Supreme court held that Federal Rule of Evidence 702 requires that a trial court "ensure that any and all scientific testimony . . . is not only relevant, but reliable." In McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997), our supreme court set forth the following list of factors for determining the reliability of scientific evidence:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as

- 17 -

formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

Nonscientific expert testimony is based on "'specialized knowledge,' that is, the expert's experience." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). In determining whether the testimony of a proffered nonscientific expert should be admitted, trial courts may consider the following:

(1) the McDaniel factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered.

Id. at 834-35.

Our supreme court has observed that an expert witness "may acquire the necessary expertise through formal education or life experiences." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Id.

Reever testified, without objection, as an expert in the area of dogfighting. She testified about her degree in animal science, her work as a veterinary technician, her training about dogfighting, and her experience investigating dogfighting. She said that she had seen ongoing dogfights and had witnessed the injuries incurred by the animals after being fought. The trial court determined that based upon the foregoing, Reever was qualified to testify regarding the injuries and scarring, and the causes thereof, to the dogs found at the Imperial Drive address. We can discern no abuse of discretion in this finding.[4]

---

[4] We note that in other jurisdictions, experts with backgrounds similar to Reever have been allowed to testify about the causes of injuries found on animals that have been fought. See State v. Schneider, 981 So.2d 107, 112 (La. Ct. App. 2008); Commonwealth v. Alfred Taylor, No. CR06-1701, 2008 WL 8201053, at *3 (Va. Cir. Ct. 2008); State v. Reginald Anderson, No. 101,235, 2010 WL 3853072, at *4 (Kan. Ct. App., Sept. 24, 2010); People v. Armond Norfleet, No. 291218, 2010 WL 3564829, at *2 (Mich. Ct. App., Sept. 14, 2010).

The Appellant complains that Reever's testimony was unreliable because his expert, Dr. Moody, testified that the dogs had not been engaged in dogfighting. "Although the trial court must analyze the science and not merely the qualifications, demeanor or conclusions of experts, the court need not weigh or choose between two legitimate but conflicting scientific views." McDaniel, 955 S.W.2d at 265. Accordingly, the Appellant's argument concerns the weight to be given Reever's testimony, not its admissibility. The weight to be attributed to an expert's testimony is a matter entrusted to the jury as the trier of fact. Id. The Appellant is not entitled to relief on this issue.

## C. Rebuttal Evidence

The Appellant argues that the trial court erred by allowing the State to introduce the Appellant's appearance bond as rebuttal evidence. The record reveals that during defense proof, several witnesses testified about the Appellant's address being on Cope Road. After the close of the defendant's proof, the State informed the trial court that it intended to introduce a certified copy of the Appellant's appearance bond, which was signed one month after the offenses, as rebuttal proof. The appearance bond listed the Appellant's address as 1207 Imperial Drive. Defense counsel objected but acknowledged that the document was a certified copy and was already "in the court file." Defense counsel further acknowledged that he had introduced documents from the water company and the power company reflecting that the Appellant's address was on Cope Road. The trial court asked defense counsel to specify the objection. Defense counsel responded that the document was hearsay. The trial court replied that because the appearance bond was certified, the objection was overruled.

On appeal, the Appellant contends that the evidence was not relevant and was redundant. He further contends that the introduction of the evidence in rebuttal unfairly emphasized its evidentiary value. The State maintains that the trial court correctly ruled that the appearance bond was proper rebuttal evidence. We agree with the State.

We note that the sole objection raised by the Appellant in the trial court was that the appearance bond was hearsay. The Appellant did not raise this complaint on appeal, thereby abandoning that issue. On appeal, the Appellant raises different objections to the admissibility of the appearance bond as rebuttal evidence. Generally, a party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. See State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). Therefore, "a defendant may not object to the introduction of evidence on one ground, abandon this ground, and assert a new basis or ground for the objection in this [c]ourt." State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988).

Although we conclude that the Appellant waived the issue, we will nevertheless briefly address his concern. "Rebuttal evidence is 'any competent evidence which

explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). "The state is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" Id. (citing State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, 1995 WL 676398, at *4 (Tenn. Crim. App. at Nashville, Nov. 15, 1995)). The admission of rebuttal evidence is within the sound discretion of the trial court, and we will not overturn the trial court's decision absent an abuse of that discretion. See State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002).

In the instant case, the Appellant adduced proof, including written documentation, that reflected his address was on Cope Road. The State rebutted this evidence with its own documentation, namely a certified copy of the Appellant's appearance bond, which was signed by the Appellant just one month after his arrest for the instant offenses. The appearance bond reflected that the Appellant's address was 1207 Imperial Drive. We conclude that the appearance bond was proper rebuttal evidence.

## D. Sufficiency of the Evidence

Initially, we note that the Appellant has phrased this argument in two separate ways: (1) whether the trial court erred in not granting judgments of acquittal at the close of the State's case and (2) whether the evidence is sufficient to support the Appellant's convictions. This court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the Appellant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The Appellant was charged with eight counts of violating Tennessee Code Annotated section 39-14-203(a)(1), which provides that "[i]t is unlawful for any person to . . . [o]wn, possess, keep, use or train any . . . dog . . . for the purpose of fighting, baiting or injuring another such animal, for amusement, sport or gain[.]" The Appellant was also charged with one count of violating Tennessee Code Annotated section 39-14-203(a)(3), which provides that it is illegal for a person to "[p]ermit any acts stated in subdivisions (a)(1) and (2) to be done on any premises under the person's charge or control, or aid or abet those acts." "Although 'keep or maintain' is not defined in our code, the definition of 'keep' is 'to watch over and defend,' 'to have the care of,' or 'to cause to remain in a given place, situation, or condition.'" State v. Laura Starkey, No. M2005-02896-CCA-R3-CD, 2007 WL 1266581, at *5 (Tenn. Crim. App. at Nashville, May 2, 2007) (quoting Webster's Third New International Dictionary 1235 (1993)); see State v. Willard V. Fleming, No. E2014-01137-CCA-R3-CD, 2015 WL 799778, at *6 (Tenn. Crim. App. at Knoxville, Feb. 25, 2015), perm. to appeal denied, (Tenn. June 15, 2015). Moreover, possession may be actual or constructive. State v. Fayne, 451 S.W.3d 362, 370 (Tenn. 2014). "[A]ctual possession refers to physical control over an item." Id. However, constructive possession requires only that the Appellant had "the power and intention at a given time to exercise dominion and control over . . . [the item] either directly or through others." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (internal quotations and citations omitted).

The Appellant was convicted of the lesser-included offense of facilitation of dogfighting in each of the nine counts. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a).

The Appellant contends that the State failed to prove that any specific individual committed the offense of dogfighting and that the Appellant substantially assisted that individual in committing dogfighting. Taken in the light most favorable to the State, the proof adduced at trial reflects that 1207 Imperial Drive was owned by Travis Trent, the Appellant's son. The Appellant, however, used the address on his checks, driver's

- 21 -

license, vehicle registrations, and appearance bond. Additionally, when the police began to search the home, the Appellant approached Sergeant McCready and stated that the house was his. The search revealed several items relating to Liberty Farms Kennel, which was established in Travis Trent's name. Photographs depicting Travis Trent and pit bulls were found during the search. Police also found four pit bulls. Reever testified that injuries and scars on each of the dogs were consistent with those of dogs that had been fought. Reever asserted that various items found at the home related to dogfighting, such as the "Sporting Dog Journal," a copy of the "Cajun Rules," and pedigrees reflecting lineages that included famous fighting dogs. The wooden treadmill, which the Appellant acknowledged making; flirt pole; spring pole; and harness found at the address were the types of items frequently used in training dogs for fighting. Several nutritional supplements for developing and recovering a dog's muscles were also found. Additionally, the police found a "crash kit" for treating a dog's wounds after a fight. The State adduced evidence that Travis Trent was in North Carolina for at least part of the foregoing month. Security video footage depicted the Appellant coming and going from the residence on four occasions during that month; on two occasions, the Appellant spent the night. During the search, the police observed that the dogs were well-fed and had adequate water. The jury could have concluded that the dogs were kept for the purpose of fighting and that the Appellant at least helped in taking care of the dogs. We conclude that, based upon the foregoing, that the evidence is sufficient to sustain the Appellant's convictions.

E. Jury Instructions

On appeal, the Appellant challenges the trial court's decision to instruct the jury on lesser-included offenses. The record reflects that after the conclusion of the defense's proof, the trial court informed the parties that it intended to charge facilitation and attempt as lesser-included offenses of the charged offense. Defense counsel responded that the Appellant "want[ed] a[n] all or nothing charge. . . . Guilty as charged or not guilty. That's the instruction he'd like to have." The court asked if defense counsel had any legal reasons for requesting an "all or nothing" instruction, and defense counsel conceded that he did not have a legal basis for the request.

The trial court said:

> There are three people named in the indictment[, even though the names of the others were redacted for the jury]. Ordinarily in those such cases the Court must charge facilitation where other people are implicated by the indictment, even though we've heard very little proof in regard . . .

But I wouldn't expect to hear any proof on those [after the redaction]. But ordinarily I have to charge that. And even if the [Appellant] makes a request that I don't charge anything embraced by the law, the case could still come back.

The trial court asked for the State's opinion, and the State agreed that the lesser-included offenses should be charged. The trial court overruled the Appellant's objection to the instruction on the lesser-included offenses.

On appeal, the Appellant asserts that the proof adduced at trial did not support the lesser-included offense of facilitation. He further asserts that the trial court abused its discretion by overruling defense counsel's objection to the instruction based upon the Appellant's trial strategy. The State asserts that the trial court correctly instructed the jury. We agree with the State.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). This court "must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Our code provides that an offense is a lesser-included offense if "[t]he offense is facilitation of the offense charged." Tenn. Code Ann. § 40-18-110(f)(2). Tennessee Code Annotated section 40-18-110 further provides in pertinent part:

> (b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, *the trial judge may charge the jury on any lesser included offense or offenses*, but no party shall be entitled to any lesser included offense charge.
>
> . . . .
>
> (d) Prior to instructing the jury on the law, the trial judge shall give the parties an opportunity to object to the proposed lesser included offense instructions. If the defendant fails to object to a lesser included offense instruction, the inclusion of that lesser included offense instruction may not be presented as a ground for relief either in a motion for a new trial or on

appeal. Where the defendant objects to an instruction on a lesser included offense and the judge does not instruct the jury on that offense, the objection shall constitute a waiver of any objection in the motion for a new trial or on appeal concerning the failure to instruct on that lesser included offense. *The defendant's objection shall not* prevent the district attorney general from requesting lesser included offense instructions or *prevent the judge from instructing on lesser included offenses.*

(Emphasis added).

A "trial court must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the theories of the parties, controls whether an instruction is required." State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002); see Moore, 485 S.W.3d at 420-21. Accordingly, despite the Appellant's desire to have an "all or nothing" charge, the trial court did not err in charging the jury on facilitation as long as the evidence supported the instruction. As we earlier concluded, the evidence was sufficient to support the conviction for facilitation of dogfighting. The Appellant is not entitled to relief on this issue.

## F. Sentencing

At the sentencing hearing, the trial court observed that the sixty-eight-year-old Appellant had been convicted of eight counts of facilitation of dogfighting. Four of the counts concerned "possessing" the dogs for fighting, and the other four counts concerned "keeping" the dogs for fighting. The court merged the counts relating to each dog. The Appellant was also convicted of facilitation of dogfighting based on the use of premises for dogfighting, for a total of five counts of facilitation of dogfighting, a Class A misdemeanor.

The trial court noted that the Appellant's presentence report reflected that the Appellant had been convicted previously of felony marijuana possession, misdemeanor marijuana possession, marijuana manufacturing, possession of unlawful drug paraphernalia, and reckless driving. During the service of the Appellant's fifteen-year sentence for the felony marijuana possession conviction, the Appellant twice violated his parole. The Appellant told the preparer of the report that he began "light use" of alcohol when he was thirty-one years old, that he had tried marijuana at age thirty-five, and that although he had occasionally used marijuana, his last use was approximately twenty years ago. The Appellant was retired but had worked as a medical coach, a welder, and a metal fabricator.

Phil Trent, the Appellant's brother, testified that the Appellant was close to the Appellant's family, especially his four grandchildren. He said that while Travis Trent had been in federal prison for the last one and one-half years, the Appellant had "provided a lot of support and parenting" for Travis Trent's child. He stated that the Appellant was a hard worker and that he could be "adventuresome" and "get into a little mischief occasionally." He opined that the Appellant would comply with the terms of probation.

On cross-examination, Phil Trent acknowledged that previously the Appellant had violated the terms of his parole by leaving Tennessee and going to Florida.

The Appellant testified that he had lived at 431 Cope Road for eleven years. The year before that, he lived at 447 Cope Road. He was a high school graduate, had attended some college, and had vocational training. He worked at a glass plant and then Eastman for twenty-two years. In 1992, he moved to Michigan and worked at four companies: Filter Systems, Welmation, Odyssey, and Thyseen. After being laid off, he moved to Florida and worked at Bobcat Metal Fabricators. When the Appellant returned to Tennessee, he worked with his brother for seven years "building medical X-ray coaches." After he retired, he began babysitting his youngest grandson, whose mother had abandoned him when he was ten weeks old. The Appellant also did some woodworking.

The Appellant did not dispute his prior criminal history. He did, however, state that his parole was revoked only once, not twice. He acknowledged that in 1992, while he was on parole for his felony conviction, he left the state so he could work and pay for his children's college education and that he accrued new misdemeanor charges that year. Nevertheless, he maintained that he was not "pick[ed] . . . back up" until 2000. He was released in 2001, and the felony sentence expired in 2008.

The Appellant said that although he had high blood pressure, his health was good "for [his] age." He asserted that he would have no problems abiding by the terms of probation. The Appellant denied being involved in the instant crimes.

On cross-examination, the Appellant said that he knew he was on parole when he left Tennessee, went to Michigan, and then to Florida. At that time, he was also avoiding pending charges. He acknowledged that he left Eastman because he was fired.

The State submitted as an exhibit an "affidavit of records of the Tennessee Department of Corrections, Department of Probation and Parole," which reflected that the Appellant's parole on his felony marijuana possession conviction was revoked on two occasions, once in 1990 and again in 2000.

The trial court found enhancement factor (1), that the Appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The trial court further found mitigating factor (1), that the Appellant's criminal conduct neither caused nor threatened serious bodily injury. Tenn. Code Ann. § 40-35-113(1). The trial court sentenced the Appellant to concurrent sentences of eleven months and twenty-nine days for each conviction. The court ordered that the Appellant serve sixty days in confinement and the remainder on probation.

On appeal, the Appellant challenges the trial court's denial of full probation. The State asserts that the trial court correctly sentenced the Appellant. We agree with the State.

The length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In misdemeanor sentencing, the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). Thus, the trial court is afforded considerable latitude in misdemeanor sentencing. See State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The trial court retains the authority to place a defendant on probation immediately or after a time of confinement. See Tenn. Code Ann. § 40-35-302(a).

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The trial court has the authority to place a misdemeanant on probation either after service of a portion of the sentence in confinement or immediately after sentencing. See Tenn. Code Ann. § 40-35-

302(e)(1)(2). However, we note that, while certain Class C, D, or E felony offenders are entitled to a presumption in favor of probation, the Appellant is entitled to no such presumption regarding his misdemeanor sentences. See State v. Williams, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995); State v. Lora Ashley, No. M2008-01563-CCA-R3-CD, 2009 WL 890890, at *3 (Tenn. Crim. App. at Nashville, Mar. 26, 2009).

Moreover, an appellant seeking full probation bears the burden of establishing his suitability for full probation, regardless of whether he is considered a favorable candidate for alternative sentencing. See State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996); see also Tenn. Code Ann. § 40-35-303(b). To prove his suitability, the appellant must establish that granting full probation will "subserve the ends of justice and the best interest of both the public and the [appellant]." State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (internal quotation marks and citation omitted), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000). Notably,

> [i]n determining one's suitability for full probation, the court may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes.

Boggs, 932 S.W.2d at 477.

The trial court observed that the Appellant had a prior criminal history of one felony conviction and several misdemeanor convictions. Additionally, the record reflects that the Appellant has previously violated parole on at least one occasion. The trial court found that a period of confinement was appropriate. Given the considerable latitude afforded to a trial court in misdemeanor sentences, we conclude that the trial court did not err in ordering the appellant to serve sixty days of his sentence of eleven months and twenty-nine days in confinement. See State v. Joel Scott Stephens, No. E2011-01774-CCA-R3-CD, 2012 WL 1077145, at *4 (Tenn. Crim. App. at Knoxville, Mar. 30, 2012).

### III. Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 27 -